**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHEAT GROWERS; NATIONAL CORN GROWERS ASSOCIATION; UNITED STATES DURUM GROWERS ASSOCIATION; WESTERN PLANT HEALTH ASSOCIATION; MISSOURI FARM BUREAU; IOWA SOYBEAN ASSOCIATION; SOUTH DAKOTA AGRI-BUSINESS ASSOCIATION; NORTH DAKOTA GRAIN GROWERS ASSOCIATION; MISSOURI CHAMBER OF COMMERCE AND INDUSTRY; MONSANTO COMPANY; ASSOCIATED INDUSTRIES OF MISSOURI; AGRIBUSINESS ASSOCIATION OF IOWA; CROPLIFE AMERICA; AGRICULTURAL RETAILERS ASSOCIATION, | No. 20-16758 <br><br> D.C. No. 2:17-cv-02401-WBS-EFB <br><br><br> OPINION |

*Plaintiffs-Appellees*,

v.

ROB BONTA, In His Official

Capacity as Attorney General of the
State of California,

*Defendant-Appellant*,

 and

LAUREN ZEISE, In Her Official
Capacity as Director of the Office of
Environmental Health Hazard
Assessment,

*Defendant*.

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted April 19, 2023
San Francisco, California

Filed November 7, 2023

Before:  Mary M. Schroeder, Consuelo M. Callahan, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Callahan;
Dissent by Judge Schroeder

# SUMMARY[*]

## First Amendment/Commercial Speech

The panel affirmed the district court's grant of summary judgment in favor of plaintiffs and its entry of a permanent injunction enjoining the California Attorney General from enforcing Proposition 65's carcinogen warning requirement for the herbicide glyphosate, best known as the active ingredient in the herbicide Roundup.

In 2015, the International Agency for Research on Cancer (IARC) identified glyphosate as "probably carcinogenic" to humans. That conclusion is not shared by a consensus of the scientific community. As a result of the IARC identification, certain businesses whose products expose consumers to glyphosate were required to provide a Prop 65 warning that glyphosate is a carcinogen. Plaintiffs, a coalition of agricultural producers and business entities, asserted that Prop 65's warning violated their First Amendment rights to be free from compelled speech.

The government may only compel commercial speech if it can demonstrate that in so doing it meets the requirements of intermediate scrutiny. However, an exception applies to compelled commercial speech that is "purely factual and uncontroversial." In that scenario, the government need only demonstrate the compelled speech survives a lesser form of scrutiny akin to a rational basis test.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel concluded that the government's proposed Prop 65 warnings as applied to glyphosate were not purely factual and uncontroversial, and thus were subject to intermediate scrutiny. The proposed warning that "glyphosate is known to cause cancer" was not purely factual because the word "known" carries a complex legal meaning that consumers would not glean from the warning without context and thus the word was misleading. Moreover, saying that something is carcinogenic or has serious deleterious health effects— without a strong scientific consensus that it does—is controversial. As to the most recent warning proposed by the California Office of Environmental Health Hazard Assessment (OEHHA), the panel held that the warning still conveys the overall message that glyphosate is unsafe, which is, at best disputed. The warning therefore requires plaintiffs to convey a controversial, fiercely contested message that they fundamentally disagree with.

Applying intermediate scrutiny, the panel held that because none of the proposed glyphosate Prop 65 warnings were narrowly drawn to advancing California's interest in protecting consumers from carcinogens, and California had less burdensome ways to convey its message than to compel plaintiffs to convey it for them, the Prop 65 warning requirement as applied to glyphosate was unconstitutional.

Dissenting, Judge Schroeder wrote that the panel should, at the very least, remand the new OEHHA warning to the district court to consider its sufficiency in the first instance. Judge Schroeder stated that: (1) there is no Supreme Court guidance on compelled commercial speech in the sphere of product liability and consumer protection and the majority's reliance on an opinion addressing compelled speech in the context of access to abortion was

misplaced; (2) the majority refused to look at the actual content of the recent OEHHA warning to determine whether it consisted of factually accurate information and instead assessed the warning's overall message; and (3) there was a strong reason for the district court to reconsider the scientific record. In Judge Schroeder's view, the new OEHHA warning fulfills the requirements of Prop 65, the validity of which was not questioned.

## COUNSEL

Laura J. Zuckerman (argued), Supervising Deputy Attorney General; Dennis A. Ragen, Andrew J. Wiener, Harrison M. Pollak, David Zonana, and Megan K. Hey, Deputy Attorneys General; Edward H. Ochoa, Senior Assistant Attorney General; Rob M. Bonta, California Attorney General; California Attorney General's Office, Oakland, California; for Defendants-Appellant.

Richard P. Bress (argued), Philip J. Perry, Andrew D. Prins, Tyce R. Walters, and Nicholas L. Schlossman, Latham & Watkins LLP, Washington, D.C.; Catherine L. Hanaway, Matthew T. Schelp, Matthew P. Diehr, and Natalie R. Holden, Husch Blackwell LLP, St. Louis, Missouri; Christopher C. Miles, Husch Blackwell LLP, Kansas City, Missouri; Ann M. Grottveit, Kahn Soares & Conway LLP, Sacramento, California; Trenton H. Norris, Hogan Lovells LLP, San Francisco, California; Stewart D. Fried and Gary H. Baise, Olsson Frank Weeda Terman Matz PC, Washington, D.C.; Richard D. Gupton, Agricultural Retailers Association, Arlington, Virgina; for Plaintiffs-Appellees.

Paul J. Napoli and Hunter J. Shkolnik, NS PR Law Services LLC, Hato Rey, Puerto Rico; Thomas C. Goldstein, Eric F. Citron, Charles Davis, Daniel Woofter, and Molly Runkle, Goldstein & Russell PC, Bethesda, Maryland; for Amicus Curiae National Black Farmers Association.

Vivian H.W. Wang, Natural Resources Defense Council, New York, New York; Avinash Kar, Natural Resources Defense Council, San Francisco, California; for Amici Curiae Natural Resources Defense Council, United Steelworkers, Alliance of Nurses for Healthy Environments, As You Sow, Californians for Pesticide Reform, Center for Food Safety, Clean Water Action, Environmental Law Foundation, Pesticide Action Network North America (PANNA), and San Francisco Bay Physicians for Social Responsibility.

Seth E. Mermin, Public Good Law Center, Berkeley, California; Eliza Duggan, Center for Consumer Law and Economic Justice; Claudia Polsky, Assistant Clinical Professor of Law; UC Berkeley School of Law, Berkeley, California; for Amicus Curiae UC Berkeley Center for Consumer Law & Economic Justice.

Cory L. Andrews and John M. Masslon II, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.

Mary-Christine Sungaila, Complex Appellate Litigation Group LLP, Newport Beach, California; Joshua R. Ostrer and Lauren Jacobs, Buchalter APC, Irvine, California; Kari Fisher, Senior Counsel, California Farm Bureau Federation, Sacramento, California; for Amici Curiae California Farm Bureau Federation, California Cotton Ginner & Growers Association, Western Agricultural Processors Association, California Fresh Fruit Association, and California Citrus

Mutual.

Tara S. Morrissey and Stephanie A. Maloney, U.S. Chamber Litigation Center, Washington, D.C.; Erika C. Frank and Heather Wallace, California Chamber of Commerce, Sacramento, California; Pratik A. Shah, James E. Tysse, and Lide E. Paterno, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; for Amici Curiae Chamber of Commerce of the United States of America and The California Chamber of Commerce.

Jonathan L. Williams, Jonathan L. Williams PA, Tallahassee, Florida, for Amici Curiae Risk-Mitigation Scholars.

Gary Roberts, Denton US LLP, Los Angeles, California; Sarah R. Choi, Dentons US LLP, San Francisco, California; for Amici Curiae California League of Food Producers, California Manufacturers & Technology Association, California Restaurant Association, California Retailers Association, Civil Justice Association Of California, American Beverage Association, American Chemistry Council, American Frozen Food Institute, American Spice Trade Association, Consumer Brands Association, Consumer Healthcare Products Association, Council for Responsible Nutrition, Frozen Potato Products Institute, Juice Products Association, Peanut and Tree Nut Processors Association, and Snac International.

**OPINION**

CALLAHAN, Circuit Judge:

This case involves the application of California Proposition 65's (Prop 65) "warning requirement" to a chemical called glyphosate. Glyphosate is a widely used herbicide in multiple settings and is best known as the main active ingredient in Roundup, a herbicide manufactured by Monsanto Company. In 2015, the International Agency for Research on Cancer (IARC) identified glyphosate as "probably carcinogenic" to humans. As a result, under the current regulatory scheme implementing Prop 65, the California Office of Environmental Health Hazard Assessment (OEHHA) was required to place glyphosate on the State's list of known carcinogens. Due to that listing, Prop 65 also requires certain businesses whose products expose consumers to glyphosate to provide a clear and reasonable warning to those consumers that glyphosate is a carcinogen. While IARC is of the view that glyphosate is probably carcinogenic to humans, that conclusion is not shared by a consensus of the scientific community.

Plaintiffs are a coalition of agricultural producers and business entities that sell glyphosate-based herbicides, use glyphosate to cultivate their crops, or process such crops into foods sold in California. Fearing, among other things, the possible risk of private enforcement actions, Plaintiffs sought to enjoin the California Attorney General (Attorney General) from enforcing Prop 65's warning requirement for glyphosate on the ground that the warning requirement violated their First Amendment rights to be free from compelled speech. Throughout this litigation, the Attorney General has offered several versions of a Prop 65 warning

that he contends comply with the First Amendment. And most recently, the Attorney General contends that OEHHA finalized a regulation permitting a version of the warning that it views to be compliant with the requirements of Prop 65.

Under our First Amendment caselaw, the government may only compel commercial speech if it can demonstrate that in so doing it meets the requirements of intermediate scrutiny. However, an exception applies to compelled commercial speech that is "purely factual and uncontroversial." In that scenario, the government need only demonstrate the compelled speech survives a lesser form of scrutiny akin to a rational basis test.

We conclude that the Prop 65 warning as applied to glyphosate—in any form that has been presented to this Court—is not purely factual and uncontroversial, and thus is subject to intermediate scrutiny. Because the Attorney General fails to meet that standard, we affirm the district court's grant of summary judgment and entry of a permanent injunction.

## FACTUAL BACKGROUND

### A. Background on Prop 65

Prop 65, also known as the Safe Drinking Water and Toxic Enforcement Act, was enacted by California voters as a ballot initiative on November 4, 1986. *See* Cal. Health & Safety Code §§ 25249.5–25249.14. Among other things, it requires the Governor to publish a "list of those chemicals known to the state to cause cancer or reproductive toxicity within the meaning of this chapter" at least once per year (Prop 65 List). *Id.* § 25249.8(a). The relevant operative provision of Prop 65 requires businesses to give a "clear and

reasonable warning" to any individual they are "knowingly and intentionally expos[ing]" to such chemicals. *Id.* §§ 25249.5, 25249.6. Businesses that violate this provision are subject to civil penalties of up to $2,500 per day for each violation. *Id.* § 25249.7(b)(1).

Prop 65 features both public and private enforcement mechanisms. It may be enforced by government officials including the Attorney General, any district attorney, and some city attorneys or city prosecutors. *See id.* § 25249.7(c). Under certain conditions, such as providing notice to the violator and the Attorney General, any person may bring a private action in the public interest to enforce Prop 65 compliance. *Id.* § 25249.7(d)–(d)(1). The private citizen enforcement provision was included in the statute to enhance enforcement of Prop 65 and deter violations, *see Yeroushalmi v. Miramar Sheraton*, 106 Cal. Rptr. 2d 332, 339 (Cal. Ct. App. 2001) (analyzing Historical and Statutory notes of the statute), but citizen enforcement lawsuits are often controversial, *see, e.g.*, *Consumer Defense Group v. Rental Housing Industry Members*, 40 Cal. Rptr. 3d 832, 834–35, n.1 (Cal. Ct. App. 2006), *as modified* (Apr. 20, 2006) (criticizing self-proclaimed "bounty hunters" for bringing litigation "obviously" for the purpose of wanting "to get paid hefty fees").[1]

---

[1] There are few limiting factors that prevent such private enforcement suits. For example, if the Attorney General upon review finds the basis for such a suit lacks merit, he is required to issue the prospective litigant a letter stating the lawsuit has no merit. Cal. Health & Safety Code § 25249.7(e)(1)(A). However, that letter has no preclusive effect on the recipient's ability to bring the lawsuit nonetheless. *See id.* § 25249.7(d)(2).

### 1.  Listing Mechanisms

As described above, the Prop 65 List is implemented by OEHHA.   Cal. Health & Safety Code § 25249.12(a). Section 25249.8 provides for four separate "mechanisms" for a chemical to be listed.  *Id.* § 25249.8(a)–(b).  Relevant here, under the "Labor Code listing mechanism," OEHHA is required to publish on the Prop 65 List carcinogenic substances as required by the California Labor Code.  *Id.* § 25249.8(a).    Specifically,    the    list    shall    include "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)."  *Id.*; Cal. Lab. Code § 6382(b)(1).  If a chemical meets the criteria required for listing under the Labor Code listing mechanism, OEHHA's role in placing it on the Prop 65 List is simply "ministerial."

### 2.  Warning Requirement and Exemptions

Once a chemical is placed on the Prop 65 List, it is also subject to the attendant "warning requirement" unless an exemption applies.  Cal. Health & Safety Code §§ 25249.6, 25249.10.  Absent an exemption, the statute requires any business with 10 or more employees[2] to provide a "clear and reasonable" warning before it "knowingly and intentionally expose[s] any individual [in California] to a chemical known to the state to cause cancer . . . ."  *Id.* § 25249.6.

The statute includes three exemptions.   First, if the warning    would    be    preempted    by    federal    law,    *id.* § 25249.10(a); second, if the exposure takes place within twelve months of the chemical's placement on the Prop 65

---

[2] "Person in the course of business" statutorily excludes businesses with fewer than 10 employees, any city, county, or district, and any federal or state agency.  Cal. Health & Safety Code § 25249.11(b).

List, *id.* § 25249.10(b); and third, if the business can prove that there is "no significant risk" assuming a lifetime exposure at the level in question (NSRL safe harbor), *id.* § 25249.10(c). The NSRL safe harbor means no more than 1 in 100,000 people are calculated to get cancer assuming lifetime exposure. Cal. Code Regs. tit. 27, § 25703(b). Businesses can either rely on the NSRL safe harbor established by OEHHA or can attempt to prove that exposure at an alternative level similarly poses no significant risk by employing their own experts. *See id.* § 25705; Cal. Health & Safety Code § 25249.10(c).

### 3. Warning Label Content

The Health and Safety Code provides that the content of the warning must be "clear and reasonable" that the chemical is "known to the state to cause cancer," or "words to that effect." Cal. Health & Safety Code § 25249.6; *Dowhal v. SmithKline Beecham Consumer Healthcare*, 12 Cal. Rptr. 3d 262, 265 (Cal. 2004). The regulations implementing Prop 65 also provide guidance regarding appropriate methods and content for businesses to provide consumers a "clear and reasonable warning." *See* Cal. Code Regs. tit. 27, §§ 25601–25603. For example, for purposes of statutory compliance, OEHHA has adopted various "safe harbor" warnings (not to be confused with the NSRL safe harbor) that are presumptively "clear and reasonable." *See id.* § 25603(a)–(b). For instance, a business may provide a warning that consists of a "yellow equilateral triangle with a bold black outline" and the word "**WARNING**" appearing in bold print and capital letters, along with the words "This product can expose you to chemicals including [name of one or more chemicals], which is [are] known to the State of California to cause cancer. For more information go to www.P65Warnings.ca.gov." *Id.* § 25603(a)(1)–(2).

Alternatively, businesses may provide a "short-form" warning, consisting of the same symbol and the word "**WARNING**" in bold print and capital letters, along with the words "Cancer – www.P65Warnings.ca.gov." *Id.* § 25603(b)(1)–(2).

While use of a safe harbor warning is optional, electing to do so has significant benefits because it shields the business from exposure to potential private enforcement lawsuits. In the event that a business chooses to utilize its own Prop 65 warning, whether that formulation is clear and reasonable is normally a "question of fact to be determined on a case by case basis." *Ingredient Commc'n Council, Inc. v. Lungren*, 4 Cal. Rptr. 2d 216, 219 & n.3 (Cal. Ct. App. 1992), *as modified* (Feb. 14, 1992) (quoting OEHHA's explanation in a Final Statement of Reasons on the interpretation of non-safe harbor warnings).

## B.  The Scientific Debate Surrounding Glyphosate

Since its introduction in 1974, glyphosate has become the world's most commonly used herbicide and is approved for use in more than 160 countries. In California, it is used in a variety of agricultural and commercial settings by private businesses and agencies alike. Given its broad usage, it is not surprising that glyphosate also happens to be one of the world's most studied chemicals. The parties in this case agree that there is no scientific consensus that glyphosate is a carcinogen. While IARC has concluded that glyphosate poses some carcinogenic hazard, federal regulators, California regulators, and several international regulators have all concluded that glyphosate *does not pose* a carcinogenic hazard. No agency or regulatory body (including IARC) has concluded that glyphosate poses a carcinogenic risk, which is distinct from a carcinogenic

hazard. *See Monsanto Co. v. OEHHA*, 231 Cal. Rptr. 3d 537, 542 (Cal. Ct. App. 2018) (noting that IARC only determines "whether an agent is capable of causing cancer but do[es] not consider the likelihood cancer will occur"). As the Attorney General observes, the distinction between hazard and risk is significant. In this context, a hazard indicates that at some theoretical level of exposure, the chemical is capable of causing cancer. Risk, on the other hand, is the likelihood that cancer will occur at a real-world level of exposure. At its core, the function of Prop 65 is to inform consumers of risks, not hazards. *See* Cal. Code Regs. tit. 27, § 25701 (explaining why a certain chemical need not include the statutory warning if it "poses no significant *risk*" (emphasis added)).

### 1.  IARC and the 2015 Study

IARC is an agency based in Lyon, France, founded to promote international collaboration in cancer research among several participating countries and the World Health Organization (WHO). IARC's Governing Council appoints "working groups" of scientific experts that prepare "monographs" on the carcinogenic hazards of chemicals. IARC selects chemicals (also referred to as "agents") for review "on the basis of two main criteria: (a) there is evidence of human exposure and (b) there is some evidence or suspicion of carcinogenicity." The working group ultimately classifies the selected chemicals into one of four categories: Group 1, 2A, 2B, or 3.[3]

---

[3] Group 1 (*carcinogenic to humans* – based on "sufficient evidence of carcinogenicity in humans"); Group 2A (*probably carcinogenic to humans* – based on "limited evidence of carcinogenicity in humans" or

From March 3, 2015, to March 10, 2015, an IARC working group convened to study several herbicides, including glyphosate. The 17-member working group reviewed existing epidemiological and cancer case-control studies, studies of cancer in experimental animals, and "mechanistic and other relevant data." In a 78-page monograph, the working group classified glyphosate as a Group 2A agent, or "probably carcinogenic to humans," based on "limited evidence" in humans and "sufficient evidence" in experimental animals.

## 2. EPA's Views

On the other hand, among other groups monitoring carcinogens, the Environmental Protection Agency (EPA) has concluded that glyphosate does not pose a cancer hazard or risk to humans. As part of its regulatory function, EPA evaluates cancer hazards to humans—including carcinogenicity—before granting registration for commercial use. *See* 7 U.S.C. §§ 136(bb), 136a(c)(5)(C)–(D); *see also* 21 U.S.C. §§ 342(a), 331(b), 346a. EPA first issued a registration for glyphosate in 1986 and has continually renewed its registration since. EPA has extensively studied glyphosate and documented its findings through a series of papers, letters, and memoranda. In 2017, EPA released an extensive issue paper evaluating the carcinogenic potential of glyphosate and concluded that

---

"sufficient evidence of carcinogenicity in animals"); Group 2B (*possibly carcinogenic to humans* – based on "limited evidence of carcinogenicity in humans" and "less than sufficient evidence of carcinogenicity in animals" or "inadequate evidence of carcinogenicity in humans" but "sufficient evidence of carcinogenicity in animals"); and Group 3 (*not classifiable as to its carcinogenicity to humans* – based on "inadequate" evidence of carcinogenicity in humans and "inadequate or limited" evidence of carcinogenicity in animals).

"[t]he available data at this time does no[t] support a carcinogenic process for glyphosate." In 2018, EPA released a memorandum that, in part, addressed IARC's 2015 study. EPA reiterated that its own finding of no carcinogenic potential was consistent with regulatory authorities from around the world, and attacked IARC's methodology because IARC only "considered a subset of the studies included in the Agency's evaluation" and included inappropriate data sets, such as genotoxicity studies of non-mammalian species such as worms, fish, and reptiles. EPA pointed out that IARC's publications were not subject to external peer review and the "conclusions [were] not well described." Finally, EPA noted that IARC's meetings lacked transparency to the public and did not allow for public comment.

In 2019, EPA again reiterated its conclusion that glyphosate was "not likely to be carcinogenic to humans." It noted that it would not approve the registration of glyphosate-based pesticides bearing a Prop 65 warning because doing so would violate the statutory requirement that a product must not be misbranded by containing a "false and misleading statement." In 2020, during the most recent registration renewal review, EPA issued an interim review decision reevaluating glyphosate's registration. In that decision, it reiterated: "EPA has thoroughly evaluated potential human health risk associated with exposure to glyphosate and determined that there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans."[4]

---

[4] As discussed *infra*, a panel of this court vacated a portion of this decision under a substantial evidence review in June 2022.

### 3.   Other Scientific Views

The agency tasked with primary regulation of Prop 65 in California, OEHHA, has twice evaluated glyphosate's potential carcinogenicity in drinking water and twice determined that it was unlikely to present a cancer hazard to humans.  Since 2007, OEHHA has not reevaluated its findings or conclusion regarding the potential carcinogenicity of glyphosate.

Like EPA and OEHHA, a significant number of international regulatory authorities and organizations disagree with IARC's conclusion that glyphosate is a probable carcinogen.  Global studies from the European Union, Canada, Australia, New Zealand, Japan, and South Korea have all concluded that glyphosate is unlikely to be carcinogenic to humans.

In sum, while IARC deems glyphosate "probably carcinogenic to humans," as the district court observed, "apparently all other regulatory and governmental bodies have found the opposite."  Although these government agencies and regulatory bodies tend to disagree over the terminology used, the data sets used, use of public comments and peer review, and much more, suffice it to say, there is a robust debate about the carcinogenicity of glyphosate.

## PROCEDURAL HISTORY

After IARC released its March 2015 monograph classifying glyphosate as "probably carcinogenic to humans," on September 4, 2015, OEHHA issued a notice of its intent to add glyphosate to the Prop 65 List.  OEHHA stated that it intended to place glyphosate on the list under the Labor Code listing mechanism and invited the public to

provide comments.  OEHHA then placed glyphosate on the Prop 65 List, effective July 7, 2017.[5]

## A. District Court Lawsuit

Plaintiffs filed this action against the Attorney General[6] in the Eastern District of California on November 15, 2017, bringing claims under the First Amendment, the Supremacy Clause, and the Due Process Clause, seeking declaratory and injunctive relief.  Plaintiffs filed their operative First Amended Complaint on December 5, 2017.  In broad terms, Plaintiffs allege they face a Hobson's choice.  On the one hand, they could comply with Prop 65 by placing the warning label on their respective products, but this would "communicate a disparaging health warning with which they disagree."  On the other hand, if they elect not to place a warning label—arguing their products' glyphosate exposure levels fall below the NSRL—they would face tremendous risk and costs defending against potential enforcement actions.

## B. Preliminary Injunction

On December 6, 2017, Plaintiffs moved for a preliminary injunction on their First Amendment claim.  Plaintiffs argued

---

[5] Monsanto sued OEHHA in California state court alleging that placement of glyphosate on the Prop 65 List violated the California and United States Constitutions.  The trial court rejected these claims and the California Court of Appeal affirmed.  *See Monsanto Co. v. OEHHA*, No. 16CECG00183, 2017 WL 3784247 (Fresno County Superior Court, March 10, 2017), *aff'd* 231 Cal. Rptr. 3d 537 (Cal. Ct. App. 2018). Appellants raised similar arguments in the district court but here have elected to focus on their compelled speech claim stemming from the Prop 65 warning requirement.

[6] Plaintiffs also sued OEHHA's director, Dr. Lauren Zeise, in her official capacity, but she was later dismissed by stipulation.

that they were likely to succeed on their claim that a compelled warning that glyphosate causes cancer violates the First Amendment. Specifically, Plaintiffs contended that the compelled warning failed under *Zauderer* because it was not "purely factual and uncontroversial." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). Plaintiffs also asserted that the balance of the equitable factors, under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), favored injunctive relief.

On February 26, 2018, the district court issued a memorandum and order granting Plaintiffs' motion in part. The district court concluded that the Attorney General failed to demonstrate the Prop 65 safe harbor warning came within the *Zauderer* exception for the following reasons: (1) while it was technically correct that glyphosate was "known to the state to cause cancer" as defined under the statute and regulations, that phrase would be misleading to an ordinary consumer; (2) any warning that was more equivocal likely would be prohibited by the regulations; and (3) the warning was not "factually accurate and uncontroversial" because IARC stood alone in its conclusion that glyphosate was probably carcinogenic to humans.

## C. Motion for Reconsideration

On March 26, 2018, the Attorney General moved to alter or amend the preliminary injunction order under Federal Rule of Civil Procedure 59(e). Among other things, the Attorney General "ask[ed] the Court to reconsider, and alter, its erroneous conclusion that *there is no possible warning that can comply with Proposition 65 and not violate the Plaintiffs' First Amendment rights*." To support this assertion, the Attorney General proffered two new variations

of warnings as "new evidence" that he argued would both comply with Prop 65 and not violate Plaintiffs' First Amendment rights.  The first, "Warning Option 1," stated:

> **WARNING:** This product can expose you to glyphosate, a chemical listed as causing cancer pursuant to the requirements of California law. For more information go to www.P65warnings.ca.gov.

The Attorney General contended that because this language maintained the core Prop 65 information but removed the "known to cause cancer" language the district court found troublesome, it was therefore "purely factual and uncontroversial information" that qualified for the lower level of review under *Zauderer*, notwithstanding the scientific disagreement between IARC and numerous other entities.

The Attorney General offered a second alternative, "Warning Option 2," which reads:

> **WARNING:** This product can expose you to glyphosate, a chemical listed as causing cancer pursuant to the requirements of California law. The listing is based on a determination by the United Nations International Agency for Research on Cancer that glyphosate presents a cancer hazard. The U.S. Environmental Protection Agency has tentatively concluded in a draft document that glyphosate does not present a cancer

hazard. For more information go to www.P65warnings.ca.gov.

Again, the Attorney General argued this version of the warning was also factual and truthful, and that the additional language clarifying the respective stances of IARC and EPA was enough to comport with *Zauderer*.

After another hearing in June 2018, the district court denied the Attorney General's motion for reconsideration. The district court held that the Attorney General did not meet the requirements of Rule 59, and that most of the new evidence presented (the alternative warnings) was not actually "new evidence." The district court also rejected the constitutionality of the alternative warnings on the merits.

Regarding Warning Option 1, the district court found it was "not significantly different from the existing safe harbor warning already rejected," and its attempt to rephrase "known to the state to cause cancer" as "causing cancer 'pursuant to the requirements of California law'" was "essentially the same message." To the extent the Attorney General contended the warning could be cured by directing consumers to the Prop 65 website, the district court opined, "[a] warning that is deficient under the First Amendment may not be cured by reference to an outside source."

With respect to Warning Option 2, the district court observed that during the hearing on the preliminary injunction motion, the district court had proposed similar language that would "provid[e] more context regarding the debate on glyphosate's carcinogenicity," but the Attorney General had rejected each of those proposals because they would "dilute" the warning. While the Attorney General argued that he could not have possibly offered such a

warning until the court's ruling, the district court disagreed, stating "the Attorney General essentially took the position that the warning he now advocates was insufficient."

Finally, the district court found that Warning Option 2 was still deficient because it improperly "conveys the message that there is equal weight of authority for and against the proposition that glyphosate causes cancer, or that there is more evidence that it does, given the language stating that the EPA's findings were only tentative, when the heavy weight of evidence in the record is that glyphosate is not known to cause cancer." Accordingly, the district court denied the motion for reconsideration in full.

## D. Motions for Summary Judgment

In September 2019, the parties filed cross-motions for summary judgment. Plaintiffs sought a permanent injunction barring enforcement of the Prop 65 warning requirement as to glyphosate for the reasons argued in their motion for a preliminary injunction, and the Attorney General sought a determination that Plaintiffs' First Amendment claim failed as a matter of law. In June 2020, the district court granted Plaintiffs' motion and denied the Attorney General's.

As it did in its order at the preliminary injunction stage, the district court discussed two possible levels of scrutiny applicable: intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 577 (1980), or "a lower standard" under *Zauderer*.

The district court again found that *Zauderer* review was inapplicable because the Attorney General did not carry his burden to show that the Prop 65 warning label was "purely factual and uncontroversial." First, the district court

reiterated that the proposed safe harbor warning is "false and misleading" because IARC was the sole agency to conclude that glyphosate causes cancer. And even though this statement was true as the term was defined in the statute and regulations, "the required warning would nonetheless be misleading to the ordinary consumer."

After rejecting additional arguments raised by the Attorney General relating to the "purely factual and uncontroversial" prong of *Zauderer*, the district court addressed and rejected each of the Attorney General's three proposed alternative warnings.[7] Warning Option 1 was misleading because it "conveys essentially the same message" as the initial safe harbor warning, and that "simply pointing consumers to a website discussing the debate" did not remedy that core problem. Warning Option 2, which provided additional context, was also deficient because it improperly conveyed a message that the scientific split was supported by "equal weight of authority . . . when the heavy weight of evidence in the record is that glyphosate is not known to cause cancer."

The district court also rejected a new proposed alternative, Warning Option 3, which provided:

> WARNING: This product can expose you to glyphosate. The State of California has determined that glyphosate is known to cause cancer under Proposition 65 because the

---

[7] The first two proposed alternative warnings from the Attorney General were proposed in his motion to reconsider, but "out of an abundance of caution," the district court addressed them in the order on the cross-motions for summary judgment. The third alternative warning, "Warning Option 3," was offered for the first time at summary judgment.

International Agency for Research on Cancer has classified it as a carcinogen, concluding that there is sufficient evidence of carcinogenicity from studies in experimental animals and limited evidence in humans, and that it is probably carcinogenic to humans. The EPA has concluded that glyphosate is not likely to be carcinogenic to humans. For more information about glyphosate and Proposition 65, see www.P65warnings.ca.gov.

At bottom, the district court found Warning Option 3 was still deficient because it conveyed the same message that glyphosate was a known carcinogen when the weight of the evidence suggested that it is not. Because none of the alternatives proposed by the Attorney General could solve this problem, the district court concluded that none of the warnings came within the scope of *Zauderer*.[8]

The district court instead applied intermediate scrutiny under *Central Hudson* and found that the proposed safe harbor warnings failed both requirements. Specifically, the district court found that although California had a substantial interest in informing consumers of cancer risks, the misleading nature of the warning about glyphosate's carcinogenicity did not directly advance that interest. Likewise, the district court found that the State had other measures to disseminate its message about glyphosate that did not burden the free speech of businesses, such as

---

[8] Because the district court found the Prop 65 warning was not purely factual and uncontroversial, the district court did not reach the interest balancing portion or the undue burden analysis under *Zauderer*.

"advertising campaigns or posting information on the Internet."

Because the district court found that the Prop 65 warning violated the First Amendment as applied to glyphosate, the district court considered whether entry of a permanent injunction was appropriate. Concluding that (1) Plaintiffs prevailed on the merits of their First Amendment claim, (2) were likely to suffer irreparable harm absent an injunction, and (3) the balance of the equities and public interest favored an injunction, the district court permanently enjoined the Attorney General from enforcing Prop 65's warning requirement as applied to glyphosate.

## E. Appeal

The Attorney General timely appealed the district court's grant of summary judgment and entry of a permanent injunction. On appeal, the Attorney General asserts that the third alternative warning, which he offered at the summary judgment stage, comes within the scope of *Zauderer* and complies with that standard. To support this assertion, the Attorney General relies primarily on *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 658 (2019) (*CTIA II*). In the alternative, the Attorney General asserts that the warning passes intermediate scrutiny under *Central Hudson*.

### STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1068 (9th Cir. 2021).

## DISCUSSION

One of the First Amendment's core purposes is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)). "The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)). While the paradigmatic First Amendment right lies in protections against speech restrictions, the Court has long held the "right to speak and the right to refrain from speaking are complimentary components" of free speech principles. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Indeed, in the context of protected speech, the First Amendment's guarantee of freedom of speech makes no distinction of "constitutional significance" "between compelled speech and compelled silence." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988).

Although commercial speech is afforded less protection than private, noncommercial speech, it is still entitled to the protections of the First Amendment. *See generally Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 64–65 (1983) (discussing recognition and evolution of commercial speech doctrine). This holds true for both corporations and individuals alike. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986).

Despite its lengthy procedural history, this case presents a single legal question that is outcome determinative: What level of scrutiny applies to the Prop 65 glyphosate warning? We answer this question by examining the Supreme Court's

compelled commercial speech doctrine found in *Zauderer* and *Central Hudson* and our precedent interpreting those cases.

## A. Threshold Issue: Two Levels of Scrutiny

The Supreme Court recognizes two levels of scrutiny governing compelled commercial speech. First, under *Central Hudson*, the Court applies intermediate scrutiny, which requires the government to "directly advance" a "substantial" governmental interest, and the means chosen must not be "more extensive than necessary." 447 U.S. at 564–66. Second, there is the lower standard applied in *Zauderer*, which requires the compelled speech be "reasonably related" to a substantial government interest and not be "unjustified or unduly burdensome." 471 U.S. at 651.

In determining which standard applies, we have previously categorized *Zauderer* as an "exception for compelled speech." *CTIA II*, 928 F.3d at 843. The Supreme Court has held that *Zauderer* review is only available "in certain contexts." *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372–73 (2018) (*NIFLA*). To qualify for review under *Zauderer*, the compelled commercial speech at issue must disclose "purely factual and uncontroversial information." 471 U.S. at 651.

Accordingly, to determine if the Prop 65 warning qualifies for the *Zauderer* exception, we first must determine whether it concerns "purely factual and uncontroversial information" before considering whether it is reasonably related to a substantial governmental interest and is not "unjustified or unduly burdensome." *See Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 755–56 (9th Cir. 2019) (*ABA II*) (en banc) (citing *NIFLA*).

## B. What Types of Compelled Speech Qualify for *Zauderer* Review?

While *Zauderer* was decided to combat deceptive and misleading commercial speech in the context of advertisements, we have expanded *Zauderer*'s reach beyond prevention of deceptive speech to other substantial governmental interests, most notably, public health.[9]  *See, e.g.*, *CTIA II*, 928 F.3d at 843–44 (collecting cases discussing permissible governmental interests potentially qualifying for review under *Zauderer*).

We first consider whether the compelled disclosure involves "purely factual and uncontroversial information." Because the Supreme Court has not expressly defined "purely factual and uncontroversial information," we look to cases applying that standard to discern its meaning.

### 1.  What is "Purely Factual"?

Information that is purely factual is necessarily "factually accurate," but that alone is not enough to qualify for the *Zauderer* exception.  *See ABA II*, 916 F.3d at 757. Our decision in *CTIA II* is illustrative.  There, the City of Berkeley had an ordinance requiring cell phone retailers to inform prospective cell phone purchasers of the risks of radio-frequency (RF) radiation from carrying cell phones on their person.  *CTIA II*, 928 F.3d at 836–38.  Notably, the

---

[9] The position that *Zauderer* should apply in the absence of a prevention-of-deception rationale is itself controversial in this Circuit.  Over several of our colleagues' opposition, we have held that *Zauderer* applies beyond that context. *See, e.g.*, *CTIA II*, 928 F.3d at 854 & n.2 (Friedland, J., concurring in part and dissenting in part); *CTIA—The Wireless Ass'n v. City of Berkeley*, 873 F.3d 774, 775 (9th Cir. 2017) (Wardlaw, J., dissenting from denial of reh'g en banc); *ABA II*, 916 F.3d at 768 (Nguyen, J., concurring in the judgment).

Federal Communications Commission (FCC) had, in conjunction with other agencies such as EPA and the Food and Drug Administration, established certain guidelines for Specific Absorption Rates (SARs) at issue for RF radiation. *Id.* at 838–40. As part of the FCC's regulatory scheme, cell phone manufacturers were required to include SAR warning limits in their user manuals as a prerequisite for FCC device approval. *Id.* at 840–41. The Berkeley ordinance "require[d] cell phone retailers to disclose, in summary form, the same information to consumers that the FCC already requires cell phone manufacturers to disclose." *Id.* at 841. CTIA, a trade association, challenged the ordinance on First Amendment and preemption grounds. *Id.* at 838.

We found that *Zauderer* review was appropriate because the RF radiation warning was "purely factual" as it only required the disclosure of accurate, factual information. *Id.* To make this determination, we employed a sentence-by-sentence analysis, and found that each sentence was factually accurate and none contained an "inflammatory warning" that CTIA complained of. *Id.* at 846–48. We did, however, note that "of course, [] a statement may be literally true but nonetheless misleading and, in that sense, untrue." *Id.* at 847. Because Berkeley's ordinance qualified for *Zauderer* review and the balance of the equities weighed in its favor, we affirmed the district court's denial of CTIA's motion for a preliminary injunction. *Id.* at 852–53.

Judge Friedland dissented in part. Specifically, she wrote that the majority engaged in a myopic review of the ordinance and faulted the majority for "pars[ing] the[] sentences individually and conclud[ing] that each is 'literally true'" and "miss[ing] the forest for the trees." *Id.* at 853 (Friedland, J., dissenting in part). Instead, Judge Friedland wrote that the overall message conveyed by the ordinance

was that carrying a cell phone was *not* safe (i.e., untrue and misleading), and ordering the cell phone retailers to convey such a message they disagreed with was unconstitutional. *Id.* Judge Friedland also warned of the "downsides to false, misleading, or unsubstantiated product warnings." *Id.* at 854–55. In particular, Judge Friedland noted that an oversaturation in warnings for minor risks tends to diminish the believability and credibility of warnings in general, and that such warnings are tantamount to "crying wolf." *Id.*

### 2. What is "Uncontroversial"?

*NIFLA* provides us some guidance on the "uncontroversial" element of *Zauderer*. There, a group of medical providers and crisis pregnancy centers challenged a California statute requiring "licensed" abortion clinics to notify women that California provides "immediate free or low-cost access" to family planning services (including abortion) and provide a phone number.[10] *NIFLA*, 138 S. Ct. at 2368–70. Those providers were required to post the notice in the waiting room, distribute it to patients, and give it digitally at check in. *Id.* at 2369.

Examining the notice requirement, the Supreme Court made several observations. First, that the requirement was "a content-based regulation of speech" because it required the speaker to convey a particular message that altered the content of their desired speech by requiring them to inform women on how to obtain state-subsidized abortions. *Id.* at

---

[10] In *NIFLA*, the Court also examined the constitutionality of notice requirements for "unlicensed" facilities, and found they did not qualify for the *Zauderer* exception because California failed to demonstrate the disclosures for those types of facilities were not "unjustified or unduly burdensome." *NIFLA*, 138 S. Ct. at 2377 (quoting *Zauderer*, 471 U.S. at 651).

2371. Second, the Ninth Circuit's carve out from strict scrutiny for "professional speech" was not recognized by the Supreme Court's traditions. *Id.* at 2371–72. Rather, lower scrutiny for professional speech was only recognized in two instances, "neither of which turned on the fact that professionals were speaking." *Id.* at 2372. One of these exceptions is *Zauderer*. *Id.* The Supreme Court found that *Zauderer* was inapplicable because: (1) the notice (for state-subsidized abortions) did not relate to the actual services provided by licensed clinics, and (2) the disclosure was about "anything but an 'uncontroversial' topic." *Id.*

*NIFLA* tells us that the topic of the disclosure and its effect on the speaker is probative of determining whether something is subjectively controversial. However, we have interpreted *NIFLA* as not "saying broadly that any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial." *CTIA II*, 928 F.3d at 845. Instead, what made the notice in *NIFLA* controversial was the fact that it "forc[ed] the clinic to convey a message fundamentally at odds with its mission." *Id.*

While the effect on the speaker is one part of the equation, an objective evaluation of "controversy" is also an important consideration. Recently, in *California Chamber of Commerce v. Council for Education and Research on Toxics*, 29 F.4th 468 (9th Cir. 2022), *reh'g denied*, 51 F.4th 1182 (Oct. 26, 2022) (*CERT*), we affirmed a preliminary injunction against the enforcement of Prop 65's warning requirement as applied to a chemical called acrylamide. *Id.* at 472–74. There, we held that a "robust disagreement by reputable scientific sources" supported the conclusion that the Prop 65 warning was "controversial." *Id.* at 478. Although *CERT* did not offer any concrete definition of

"controversial," it noted "[h]owever controversial is defined, the acrylamide Prop. 65 warning easily meets the definition because of the scientific debate."  *Id.* at 478 & n.10.

### 3. Is the Prop 65 Glyphosate Warning "Purely Factual and Uncontroversial"?

The district court found the standard safe harbor Prop 65 glyphosate warning not to be purely factual because it was false and misleading.  In particular, the district court explained that while California may literally "know" that glyphosate causes cancer as defined by the statute and regulations, an ordinary consumer would not understand the nuance between "known" as defined in the statute and "known" as commonly interpreted without knowledge of the scientific debate on that subject.

This conclusion finds support in both *CTIA II* and *CERT*. While the *CTIA II* majority found that each sentence of the warning about RF radiation exposure was accurate and thus the disclosure read in whole was not misleading, that is not true in this case because it is unclear what the term "known" means to the consumer.  As we held in *CERT*, "[u]nder Prop. 65, a 'known' carcinogen carries a complex legal meaning that consumers would not glean from the warning without context" and "[t]hus, use of the word 'known' is misleading."  29 F.4th at 479.

Moreover, the safe harbor Prop 65 glyphosate warning is not "uncontroversial."  From the standpoint of an average consumer, saying that something is carcinogenic or has serious deleterious health effects—without a strong scientific consensus that it does—remains controversial.  It is also controversial from the subjective standpoint of the speakers, as Plaintiffs assert that they are being forced "to convey a message fundamentally at odds" with their

businesses. *See CTIA II*, 928 F.3d at 845. Also, the warning requirement applied to glyphosate is undeniably controversial from an objective scientific standpoint. Although "uncontroversial" does not mean "unanimous," here IARC stands essentially alone in its determination that glyphosate is probably carcinogenic to humans, while EPA, OEHHA, and regulators from around the world conclude that it is not.

*CERT* is instructive on this point. There, we affirmed a finding that the acrylamide warning was controversial in the face of a much more even debate. *See CERT*, 29 F.4th at 478. While EPA, IARC, and the U.S. National Toxicology Program each classified acrylamide as some level of a carcinogen, the American Cancer Society, the National Cancer Institute, and an "epidemiologist who reviewed 56 studies" concluded that it was not carcinogenic. *Id.* We found this to be a "robust disagreement" and agreed that the safe harbor warning was "controversial because it elevates one side of a legitimately unresolved scientific debate about whether eating foods and drinks containing acrylamide increases the risk of cancer." *Id.* The same conclusion must apply here, where IARC and EPA are on opposite sides of the scientific debate, and scientific consensus is much less evenly distributed.[11]

---

[11] A few of the *amici curiae*, along with our dissenting colleague, warn of the dangers of interpreting "controversial" too broadly. In particular, they contend that large companies would have a perverse incentive to "manufacture" a scientific controversy where none exists. While these concerns may have some validity, we are not convinced that here any such controversy was artificially manufactured.

## C. Does Warning Option 3 Qualify for *Zauderer* Review?

Before the district court, the Attorney General offered three proposed warnings as alternatives to the standard safe harbor warning at various stages of the litigation. On appeal, he focuses on the third, which, for the sake of convenience, we repeat:

> WARNING: This product can expose you to glyphosate. The State of California has determined that glyphosate is known to cause cancer under Proposition 65 because the International Agency for Research on Cancer has classified it as a carcinogen, concluding that there is sufficient evidence of carcinogenicity from studies in experimental animals and limited evidence in humans, and that it is probably carcinogenic to humans. The EPA has concluded that glyphosate is not likely to be carcinogenic to humans. For more information about glyphosate and Proposition 65, see www.P65warnings.ca.gov.

The district court rejected this warning, holding that even though it contained additional context, "it once again states that glyphosate is known to cause cancer and conveys the message that there is equal weight for and against the authority that glyphosate causes cancer, when the weight of evidence is that glyphosate does not cause cancer."

Nonetheless, the Attorney General contends that this warning is permissible under *CTIA II* because it is "nuanced," "contains indisputably accurate factual

statements, and there is nothing misleading about the warning as a whole." He contends that employing the sentence-by-sentence analysis used in *CTIA II*, each assertion in Warning Option 3 is purely factual. Even accepting that the Attorney General is correct that each sentence is entirely and literally true, that is not enough. As *CTIA II* itself held, the totality of the warning may not be "nonetheless misleading." 928 F.3d at 847. Fairly viewed, Warning Option 3 fails for the same reasons the standard safe harbor warning fails. It conveys the same core message that California *knows* glyphosate causes cancer (which is contrary to the opinion of EPA and others) even though the technical meaning of the word "known" in the warning is different from the meaning an average consumer would give the word "known." While Warning Option 3 does reference the scientific debate, and provides literally true statements about IARC and EPA, it still improperly "elevates one side of a legitimately unresolved scientific debate." *CERT*, 29 F.4th at 478.

For many of the same reasons, Warning Option 3 is also controversial. It still requires Plaintiffs to convey a message that they fundamentally disagree with. *See CTIA II*, 928 F.3d at 845. While the Attorney General argues that this case bears "no meaningful distinction" from *CTIA II*, we disagree. The most obvious distinction is the warning approved by the *CTIA II* court did not include a statement that the City of Berkeley "knew" RF frequencies cause cancer or health related issues, or otherwise placed the imprimatur of the city behind the assertions. Nor did it offer any scientific statements that a federal regulatory agency viewed as false. To the contrary, the FCC already required cell phone manufacturers to provide a similar disclosure. In other words, while a compelled restatement of an undisputed

federal requirement is not controversial, a compelled statement of a hotly disputed scientific finding is.**[12]**

We reiterated this point in a decision holding that a more factually analogous ordinance failed *Zauderer* review. In *CTIA—The Wireless Ass'n v. City & County of San Francisco*, 827 F. Supp. 2d 1054 (N.D. Cal. 2011), the City of San Francisco had an ordinance requiring cell phone service providers to distribute a factsheet that included the statement: "ALTHOUGH STUDIES CONTINUE TO ASSESS POTENTIAL HEALTH EFFECTS OF MOBILE PHONE USE, THE WORLD HEALTH ORGANIZATION HAS CLASSIFIED RF ENERGY AS A POSSIBLE CARCINOGEN." *Id.* at 1058. The district court enjoined the distribution of the ordinance's fact-sheet, concluding that although mostly factually true, there were several misleading omissions which left the "overall impression . . . that cell phones are dangerous and that they have somehow escaped the regulatory process." *Id.* at 1062–63. We affirmed the district court in a memorandum disposition, finding that the original ordinance as enjoined was "misleading and controversial." *CTIA—Wireless Ass'n v. City & Cnty. of San Francisco*, 494 F. App'x 752, 754 (9th Cir. 2012). Although not binding, we agree with the reasoning expressed in that decision.

---

[12] Contrary to the dissent's critique, we do not hold Warning Option 3 controversial simply because its message runs counter to Plaintiffs' business interests. Rather, mandating the display of Warning Option 3 is controversial because Plaintiffs do not agree with its message *and* Plaintiffs' disagreement is currently supported by a majority of the authorities in this as-yet-unresolved scientific debate.

In sum, Warning Option 3 does not qualify for the lower level of review under *Zauderer* because it is neither "purely factual" nor "uncontroversial."

## D. Intervening Developments

After the conclusion of the principal briefing in this case, we granted the Attorney General's unopposed motion to hold the appeal in abeyance until completion of OEHHA's final regulation that was to promulgate the appropriate "safe harbor" Prop 65 warning for glyphosate. In September 2022, OEHHA completed its final rulemaking, authorizing a new, glyphosate-specific safe harbor Prop 65 warning (OEHHA Warning). The OEHHA Warning must contain "**CALIFORNIA PROPOSITION 65 WARNING**"[13] in capital letters and bold print, and contain the words:

> Using this product can expose you to glyphosate. The International Agency for Research on Cancer classified glyphosate as probably carcinogenic to humans. US EPA has determined that glyphosate is not likely to be carcinogenic to humans; other authorities have made similar determinations. A wide variety of factors affect your potential risk, including the level and duration of exposure to the chemical. For more information, including ways to reduce your

---

[13] In certain instances, "the word 'ATTENTION' or 'NOTICE' in capital letters and bold type may be substituted for the words 'CALIFORNIA PROPOSITION 65 WARNING'." Cal. Code Regs. tit. 27, § 25607.49(b).

> exposure,                    go                    to
> www.P65Warnings.ca.gov/glyphosate.

Cal. Code Regs. tit. 27, §§ 25607.48, 25607.49(a).  At our direction, the parties each filed supplemental briefs addressing the impact of the OEHHA Warning.[14]

We hold that the text and substance of the OEHHA Warning does not fundamentally alter our analysis or our conclusion that a compelled warning that glyphosate is a likely carcinogen does not qualify for review under *Zauderer*.

### 1.  The OEHHA Warning Is Not Materially Different

OEHHA adopted the new warning to "tak[e] into account the concerns expressed [by] the District Court."  During this rulemaking, OEHHA consulted with EPA to revise the warning language, acknowledging EPA's stance that the previous proposed safe harbor warning was false and misleading in view of its determination that glyphosate was not likely carcinogenic to humans.

The Attorney General argues that the OEHHA Warning qualifies for review under *Zauderer* for two main reasons.

---

[14] In their briefing, the parties also address our recent decision in *National Resources Defense Council v. U.S. Environmental Protection Agency*, 38 F.4th 34 (9th Cir. 2022) (*NRDC*).  There, under a substantial evidence review, we vacated a portion of EPA's 2020 interim registration decision that reaffirmed EPA's view that glyphosate is "not likely to be carcinogenic to humans."  *Id.* at 45–52, 62. While the Attorney General contends this decision constitutes a changed circumstance warranting reversal or vacatur, that argument has little bearing on the First Amendment analysis.  Moreover, EPA has already reaffirmed that it believes the scientific evidence supports its choice of hazard descriptor, and that it "intends to revisit and better explain its evaluation."

First, it omits the language that glyphosate is "known to the state of California to cause cancer." Second, it addresses the district court's concerns that the previous warnings improperly conveyed an equal consensus among scientific regulators. While these are true observations, they do not alter the overall message.

Like Warning Option 3, each statement may be factually true, but also like Warning Option 3, the OEHHA Warning still conveys the overall message that glyphosate is unsafe which is, at best, disputed. *See CTIA II*, 928 F.3d at 853 (Friedland, J., dissenting in part). Even though IARC and EPA are put on equal footing in this version, the OEHHA Warning still "elevates one side of a legitimately unresolved scientific debate." *CERT*, 29 F.4th at 478. The statement after the semicolon, that "other authorities have made similar determinations," is ambiguous and omits the breadth of the scientific consensus that glyphosate is *not* a likely carcinogen. But the implication remains that science is essentially in equipoise.

And the OEHHA Warning adds an additional concern from the other versions offered by the Attorney General. As discussed above, IARC has only opined that glyphosate poses a potential cancer "hazard," meaning that at some theoretical level of exposure, it could cause cancer. The OEHHA Warning does not use the word "hazard," although it correctly frames the discussion as one based on exposure. But in its fourth sentence, the OEHHA Warning states: "A wide variety of factors affect your potential *risk*, including the level and duration of exposure to the chemical." Cal. Code Regs. tit. 27, § 25607.49(a)(3) (emphasis added). No agency or regulatory body has determined that glyphosate poses a carcinogenic "risk." By using the word "risk," the OEHHA Warning is factually misleading because a

reasonable person reading it would understand this to mean that glyphosate poses a *risk* not a *hazard*.

Even if we found the OEHHA Warning to be "purely factual," the disclosure remains controversial. In *CERT*, the panel observed "that no court appears to have ever directly held that the government can never compel factually accurate but 'controversial' speech, no matter the government interest, and no matter how compelling its reasons. We leave that question for another day." 29 F.4th at 480 n.14. We likewise leave that question for another day because the OEHHA Warning, like the other alternative versions, remains controversial. To summarize, the OEHHA Warning is controversial because (1) of the unresolved scientific debate over glyphosate's carcinogenicity, and (2) it still requires Plaintiffs to alter their desired message for the State's preferred message that glyphosate presents a health risk.

### 2.   Remand Is Not Necessary

Although the Attorney General asks us, at a minimum, to remand to the district court for consideration of the adequacy of the OEHHA Warning, we decline to do so. A remand is not necessary "where a complete understanding of the issues may be had by the appellate court without the necessity of separate findings." *Richmond Elks Hall Ass'n v. Richmond Redev. Agency*, 609 F.2d 383, 385–86 (9th Cir. 1979) (citing *Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975)); *see also In re Pintlar Corp.*, 133 F.3d 1141, 1145 (9th Cir. 1998) ("Remand is not necessary where the issue has been fully briefed on appeal, the record is clear and remand would impose needless additional expense and delay." (cleaned up)). Based on the entire record before us, we see no reason to remand and thus cause further delay.

As the Court held in *Zauderer*, "[w]hen the possibility of deception is as self-evident as it is in this case, we need not require the State to 'conduct a survey of the ... public before it [may] determine that the [advertisement] had a tendency to mislead.'" 471 U.S. at 652–53 (quoting *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 391–92 (1965) (ellipsis in original)). We see no reason to remand because the issues plaguing the OEHHA Warning could not be cured by any sort of factual development. While the OEHHA Warning changes the wording about the scientific debate, it does not change the fact that a deep scientific debate still exists.

Nor does it change the fundamental analysis of the applicability of *Zauderer*'s exception as a matter of law. As cases such as *CERT* have made clear, the presence of a genuine, scientific controversy is sufficient to place a Prop 65 warning outside the realm of the lower level of review under *Zauderer*. This conclusion is grounded in basic First Amendment principles that protect against compelled speech. Stated another way, "history and tradition provide no support for . . . free-wheeling government power to mandate compelled commercial disclosures." *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 32 (D.C. Cir. 2014) (Kavanaugh, J., concurring) (noting among other things, that "consumer desire" for a person to know if a doctor had ever performed an abortion could not support a compelled disclosure). To the contrary, the Supreme Court has made clear that a state may not regulate commercial speech on the back of controverted evidence. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792–93 (2011) (striking down California's Assembly Bill 1179, regulating the sale and rental of "violent video games" to minors, and requiring their packaging to be labeled "18."); *see also id.* at 858 (appendices, noting compilation of "controverted" evidence

supporting conclusion that violent video games cause children psychological harm). Ultimately, the OEHHA Warning requires Plaintiffs to convey a controversial, fiercely contested message that they fundamentally disagree with. Such government action may not be reviewed under the lessened degree of scrutiny found in *Zauderer*.

## E. Does any Iteration of the Prop 65 Glyphosate Warning Survive Intermediate Scrutiny?

Because no version of the Prop 65 glyphosate warning comes within the scope of the exception found in *Zauderer*, we consider whether it passes intermediate scrutiny under *Central Hudson*. Under that standard, the government may compel a disclosure of commercial speech only if (1) it directly advances a substantial governmental interest, and (2) the restriction is not more extensive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 566.

California unquestionably has a substantial interest in preserving the health of its citizens. *See Semler v. Or. State Bd. of Dental Exam'rs*, 294 U.S. 608, 612 (1935) (public health is a "vital interest"). However, compelling sellers to warn consumers of a potential "risk" never confirmed by any regulatory body—or of a hazard not "known" to more than a small subset of the scientific community—does not directly advance that interest. Further, as the Supreme Court noted in holding that the licensed notice requirement failed intermediate scrutiny in *NIFLA*, we observe that California could employ various other means to promote its (minority) view that glyphosate puts humans at risk of cancer "without burdening [Plaintiffs] with unwanted speech." 138 S. Ct. at 2376 (internal quotation marks omitted). For example, the State could reasonably post information about glyphosate on its own website or conduct an advertising campaign. Neither

of those mechanisms "co-opt [Plaintiffs] to deliver its message for it." *Id.*

## CONCLUSION

The State and the Attorney General undoubtedly have good and legitimate interests and strong policy arguments in support of seeking to proactively warn California citizens about a chemical that they deem to be carcinogenic. Moreover, as several *amici* argue, there can be inherent risks associated with a "wait-and-see" approach when it comes to forms of evolving science. But the fact that science is evolving is all the more reason to provide robust First Amendment protections. This holds even more true when the State is free to advance its own views without using others as a "billboard." *See Wooley*, 430 U.S. at 715. The deprivation of "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Although commandeering speech may seem expedient, it is seldom constitutionally permissible. Considering the current vigorous debate surrounding the scientific validity of glyphosate's carcinogenicity, forcing Plaintiffs to convey that message cannot be said to be an uncontroversial proposition. Because none of the proposed glyphosate Prop 65 warnings are narrowly drawn to advancing California's interest in protecting consumers from carcinogens, and California has less burdensome ways to convey its message than to compel Plaintiffs to convey it for them, the Prop 65 warning as applied to glyphosate is unconstitutional. The judgment and injunction order of the district court is **AFFIRMED**.

Schroeder, Circuit Judge, dissenting:

This court should, at the very least, remand the new OEHHA warning to the district court to consider its sufficiency in the first instance. The warning consists of five factually accurate sentences informing users that the product can expose them to a substance the IARC has determined probably causes cancer. It further advises that the EPA and others have concluded the substance probably does not cause cancer and then directs the reader to an informational website. The warning fulfills the requirements of Prop 65, the validity of which is not questioned. As codified, Prop 65 requires listing substances that the IARC considers carcinogens. *See* Cal. Health & Safety Code §§ 25249.8(a), 25249.6; Cal. Labor Code § 6382(b)(1).

Yet the majority decides in the first instance that the new warning is not factual and that it is controversial. The majority apparently does so because of the very scientific disagreement the new warning discloses. In my view, the district court should take the first look for three fundamental reasons, none of which the majority addresses.

First, we have no guidance from the Supreme Court on compelled commercial speech in the sphere of product liability and consumer protection. The majority looks to *Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("NIFLA") for guidance as to what may be "uncontroversial," yet that case concerns compelled speech about the hyper-controversial subject of access to abortion. It has nothing to do with consumer protection. The majority says that compelling a message "at odds with its mission" is a harbinger of controversy, yet every warning of a product's risk to consumers bears a message at odds with the manufacturer's mission to sell more products.

Second, the majority refuses to look at the actual content of the new warning, even though our circuit law looks to the content of the message rather than the nature of the controversy. *See CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 845-46 (9th Cir. 2019) ("CTIA II"). We there found review appropriate under *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985) because the warning consisted of factually accurate information. We employed a sentence-by-sentence analysis. The majority here adopts the position of the dissent in CTIA II, looking instead to what the majority views as the overall message.

Third, the majority adopts the district court's conclusion that the existence of scientific debate over the safety of glyphosate precludes any warning requirement. It looks to the EPA's decision that glyphosate was not likely to be carcinogenic to humans. Yet this court recently vacated the EPA's decision on the ground it was not supported by substantial evidence. *See Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 38 F.4th 34, 51 (9th Cir. 2022). The majority merely accepts the EPA's promise it will do better some time in the future. There remains no adequate basis for reliance on the EPA, and a strong reason for the district court to reconsider the scientific record.

Moreover, the new warning takes out the language the district court had found misleading in the earlier iterations. The district court had concluded that the requirement that businesses disclose that glyphosate is "known to the state of California to cause cancer" was misleading because the warning, in the court's view, conveyed without qualification that "glyphosate is known to cause and actually causes cancer." The new warning does not include any such language.

The majority appears to read *Zauderer* too narrowly by suggesting that if there is any disagreement involving the subject matter, *Zauderer* cannot apply, even if what the state actually requires is factual information. Yet the Court in *Zauderer* said heightened scrutiny is not required where the state calls for "purely factual and uncontroversial information" without prescribing a confession of faith in what amounts to matters of opinion. *Zauderer*, 471 U.S. at 651. In a scientific context, as presented here, our understanding of what is noncontroversial should not require scientific unanimity. We should learn from the historic episodes where hazardous product manufacturers have themselves manufactured controversy by financing studies to create doubt about the hazards they were creating. *See* Naomi Oreskes & Erik M. Conway, *Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warming* 13 (2010).

The OEHHA warning is at least arguably sufficiently narrowly tailored under *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980). California offers alternatives to its warning requirements. Where employers comply with the warning and labeling requirements of the OSHA regulations for glyphosate, no separate Prop 65 warning need be provided at all. *See* Cal. Code Regs. tit. 27, § 25606. The statute also does not specify any words that must be included in a Prop 65 warning label. The preamble states:

> The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies have failed to provide them with adequate protection, and that these

failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs.

*AFL-CIO v. Deukmejian*, 260 Cal. Rptr. 479, 480 (Cal. Ct. App. 1989) (quoting Prop 65 preamble). Ultimately, Prop 65 was passed for precisely the reason that nothing else had worked.

There are thus serious issues the majority glosses over and the district court should consider. I therefore respectfully dissent.